UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

E. MICHELLE DELBRUEGGE,           )
                                  )
                Plaintiff,        )
                                  )
        v.                        )        No. 4:10 CV 730 JCH / DDN
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security   )
                                  )
                Defendant.        )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final
decision of defendant Commissioner of Social Security denying the
application of plaintiff E. Michelle Delbruegge for disability insurance
benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et
seq. The action was referred to the undersigned United States Magistrate
Judge for review and a recommended disposition under 28 U.S.C. § 636(b).
For the reasons set forth below, the undersigned recommends that the
decision of the administrative law judge (ALJ) be affirmed.

## I.  BACKGROUND

Plaintiff E. Michelle Delbruegge was born on October 3, 1957. (Tr.
87.) She is 5'8" tall and weighs 185 pounds. (Tr. 124.) She is married
and lives with her husband. (Tr. 28.) She last worked cleaning houses
in January, 2008. (Tr. 30.)

On June 30, 2006, Delbruegge applied for disability insurance
benefits, alleging that she became disabled on September 30, 2004 on
account of two herniated discs, osteochondritis dissecans[1] in her right
ankle, and anxiety. (Tr. 87-91, 125.) She amended her disability onset
date to July 6, 2005. (Tr. 13, 28.) She received a notice of

---

[1]Osteochondritis dissecans is the complete or incomplete separation
of a portion of joint cartilage and underlying bone, usually involving
the knee, associated with epiphyseal aseptic necrosis. Stedman's Medical
Dictionary 1389 (28th ed. 2006).

disapproved claims on September 15, 2006. (Tr. 63-67.) She filed a written request for a hearing on November 2, 2006.[2] (Tr. 70.) After a hearing on July 15, 2008, the ALJ denied benefits on July 22, 2008. (Tr. 8-21, 25-56.) On February 26, 2010, the Appeals Council denied her request for review.[3] (Tr. 1-5.) Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. ADMINISTRATIVE RECORD

On June 23, 2000, Delbruegge was seen by Gregory Jewell, M.D., for complaints of excessively heavy menstrual periods. (Tr. 294.) She told Dr. Jewell she wanted a hysterectomy and to have her ovaries removed to prevent ovarian cancer. (Id.)

On January 4, 2001, Delbruegge was seen by Dr. Jewell for an annual visit. (Tr. 293.) Dr. Jewell noted that she was taking Estratest after having a hysterectomy, but was switched to Premarin.[4] (Id.) Dr. Jewell also noted a significant history of depression in her family, and that Delbruegge reported suffering from depression, anxiety, decreased interest in normal activities, and insomnia. (Id.) She was to continue taking Premarin and return for re-evaluation. (Id.) She was later prescribed Prozac, which Dr. Jewell later changed to Paxil.[5] (Id.)

---

[2]Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case. 20 C.F.R. §§ 404.906, 404.966 (2007). These modifications include, among other things, the elimination of the reconsideration step. See id.

[3]The Appeals Council's denial of review also stated that Delbruegge was found to be disabled beginning on July 23, 2006, based on increased pain and continuing degeneration as assessed by Stephen Schmidt, M.D., on August 25, 2008. (Tr. 2.)

[4]Estratest is used for the short-term treatment of menopause symptoms. Premarin is a female hormone used for reducing menopause symptoms. http://www.webmd.com/drugs (last visited April 14, 2011).

[5]Prozac is used to treat depression, panic attacks, and premenstrual dysphoric disorder. Paxil is used to treat depression, panic attacks, anxiety disorders, and a severe form of premenstrual syndrome. http://www.webmd.com/drugs (last visited April 14, 2011).

From January 27, 2001 through June 1, 2006, Delbruegge went to the Southwest Medical Center for screening mammograms and chest examinations. (Tr. 326-32.) Each of the mammograms returned negative, and her lungs and heart were normal. (Id.)

On April 3, 2001, Delbruegge was seen by Jeffrey A. Atkins, M.D., for a check-up. (Tr. 322.) Dr. Atkins noted that she was smoking less than one pack daily, and was drinking two weekends a month. (Id.) Dr. Atkins diagnosed her with benign skin tumors, generalized anxiety, and headaches, and prescribed her Alprazolam and Maxalt.[6] (Id.) Dr. Atkins continued to see her through 2006, during which time he authorized refills of her prescriptions. (Tr. 312-16, 319-25.)

On June 4, 2001, Dr. Jewell saw Delbruegge for an annual visit. (Tr. 296.) She was taking Premarin and Paxil, and reported being under stress and having difficulty sleeping. (Id.) Dr. Jewell recommended a colonoscopy because of her family history of colon cancer. (Id.)

On November 9, 2001, Delbruegge was seen by Margaret Freihaut, D.C., for lower back pain, nausea, and breathing pain. (Tr. 221, 230.) Her pain had worsened during the week, such that any movement caused pain. (Tr. 230.) She reported a history of neck pain and stress within the previous six months. (Tr. 222.) Her dorsal flexion extension was 75 degrees, and lateral flexion was 40 degrees. (Tr. 226.) Working impressions were acute lumbar sublux with muscle spasms. (Tr. 231.) She was told to treat the pain with ice, and to refrain from working for a week. (Id.) A MRI was taken of her lumbar spine and pelvis. (Tr. 228.)

On November 28, 2001, Duane Marquart, D.C., opined that the MRI of Delbruegge's spine revealed a left tilt above her L4 disc wedging; flat lumbar contour; facet arthrosis, resulting in degenerative anterolisthesis of L4; and spondylosis to varying degrees throughout. (Tr. 228.) An MRI of her pelvis revealed a left extremity deficiency with pelvis and sacrum unleveling; posterior pelvis rotation; no evidence of acute fracture; and sacroiliac arthrosis. (Tr. 228.)

_____

[6]Alprazolam is used to treat anxiety and panic disorders. Maxalt is used to treat migraines. http://www.webmd.com/drugs (last visited April 14, 2011).

On June 12, 2002, Dr. Jewell saw Delbruegge for an annual visit. (Tr. 292.) She was taking Premarin but was switched to the generic Estrace,[7] and was taking Prozac, but believed she needed stronger dosage. (Id.) Dr. Jewell increased her dosage from 20mg to 40mg. (Id.)

On May 6, 2003, Delbruegge saw Gregory Jewell, M.D., for an annual visit. (Tr. 291.) She was taking Estrace, which Dr. Jewell recommended tapering off in 1-2 years, and Prozac for mild depression symptoms. (Id.) She was feeling great and wanted to continue taking Prozac. (Id.)

On June 10, 2003, Douglas Parashak, M.D., noted that Delbruegge was having difficulty breathing. (Tr. 317.) Dr. Parashak noted that Delbruegge had smoked a half of a pack of cigarettes that day, and had no chest pain, tightness, nausea, or back pain. (Id.) Dr. Parashak opined that she had asthma that was exacerbated by a sinus infection. (Id.) Dr. Parashak recommended that she stop smoking, and prescribed nebulizer treatment, Advair, Combivent, Prednisone, and Singulair.[8] (Id.)

On April 1, 2004, Dr. Jewell saw Delbruegge for an annual visit. (Tr. 290.) Delbruegge was menopausal, had a hysterectomy in the past, and was taking Estrace. (Id.) She had quit her job, and was trying to wean herself off of her medications. (Id.)

On June 14, 2004, Delbruegge was seen by Jerald A. Maslanko, M.D., for evaluation and treatment following a work-related injury. (Tr. 375-80.) Delbruegge reported injuring her back when she was lifting a 40-50 pound box of soda at work; the box began to slip, causing her to jerk her back. (Tr. 377.) Dr. Maslanko noted that Delbruegge had serous back pain

---

[7]Estrace is a female estrogen hormone that is usually given to women who no longer produce the amount of estrogen they produced before menopause. It is used to treat common menopause symptoms. http://www.webmd.com/drugs (last visited April 14, 2011).

[8]Advair is used to control and prevent symptoms (wheezing and shortness of breath) caused by asthma and ongoing lung disease (such as COPD). Combivent is used to prevent wheezing and shortness of breath caused by ongoing breathing problems. Prednisone is used to treat conditions such as arthritis, blood disorders, breathing problems, severe allergies, skin diseases, cancer, eye problems, and immune system disorders. Singulair is used to prevent the wheezing and shortness of breath caused by asthma and decreases the number of asthma attacks. http://www.webmd.com/drugs (last visited April 14, 2011).

with left leg radiation, a possible disc injury, and markedly reduced range of motion. (Tr. 375.) Straight leg raising testing returned negative in her lower right lower extremity, but positive in her left lower extremity. (Tr. 377.) Dr. Maslanko recommended that she have a MRI or back spec exam and that she apply warm compresses three times a day for 10-15 minutes. (Tr. 375.) Dr. Maslanko also ordered orthopedic consultation and prescribed Ibuprofen and Propoxyphen.[9] (Tr. 377, 381.)

On June 23, 2004, David Raskas, M.D., evaluated Delbruegge. (Tr. 385.) Dr. Raskas noted that Delbruegge's lower back pain bothered her more than her leg pain, and that her left leg pain bothered her more than her right leg pain. (Id.) Regarding her leg pain, Dr. Raskas noted that her pain was in her whole leg; it did not follow a specific radicular pattern; it went below the knee occasionally; and she did not have any numbness or tingling in her legs. (Id.) Delbruegge initially reported hurting her back when changing the gas price on an outside sign on June 11, 2004, but later clarified that this occurred in February, and that her June 11, 2004 injury happened when she was lifting a 40-50 pound box. (Tr. 385-86.) She also reported having a back strain in the past that took 2-3 months to get better in 2001, and that she had a MRI done, but did not know where. (Tr. 385.)

Dr. Raskas conducted a physical examination, which revealed that Delbruegge's gait was normal; her muscle strength in her upper and lower extremities was normal; and that straight leg raise testing was negative. (Id.) Dr. Raskas noted that her range of motion of her lumbar spine was very limited, and recommended an MRI of her lumbar spine because of her episodes of incontinence. (Id.) Dr. Raskas opined that she remain off work, continue a walking program at home, and do home exercises. (Id.) Dr. Raskas prescribed Vioxx and ordered a refill of her Darvocet.[10] (Id.)

---

[9]Propoxyphene is used to help relieve mild to moderate pain. http://www.webmd.com/drugs (last visited April 14, 2011).

[10]Vioxx is used to treat migraine headaches, rheumatoid arthritis, joint inflammatory disease, and other types of pain. Darvocet is used to relieve mild to moderate pain. http://www.webmd.com/drugs (last visited April 14, 2011).

On July 15, 2004, Patricia A. Hurford, M.D., M.S., wrote that Delbruegge had been seen by Dr. Raskas and diagnosed with a disc herniation at the L4-5 level. (Tr. 270.) Delbruegge was having back and left gluteal pain radiating to her anterior thigh on the left side and below her knee affecting her entire leg with any prolonged standing and walking. (Id.) Delbruegge rated her pain at a 7/10, and was scheduled for a left L4-5 epidural steroid injection that day. (Id.) At the time, she was taking Fluoxetine,[11] Alprazolam, Vioxx, and Estradiol.[12] (Id.) She reported smoking a half of a pack of cigarettes daily, and that she had not worked since her injury. (Id.) Dr. Hurford conducted a physical exam, which revealed a slightly antalgic gait pattern and impaired pinprick sensation in Delbruegge's entire left lower extremity. (Tr. 271.) Straight leg raise testing from the seated position was negative. (Id.) Dr. Hurford diagnosed Delbruegge with a herniated disc at L4-5, and recommended a transforaminal epidural steroid injection at L4-5 on the left side. (Id.) Delbruegge was given the epidural steroid injection that day. (Tr. 387.)

On August 5, 2004, Delbruegge was admitted to Missouri Baptist Medical Center with a diagnosis of L4-5 herniated nucleus pulposus.[13] (Tr. 233, 235.) She was taking Darvocet and Prozac; smoked half a pack of cigarettes daily; and had no pain relief from physical therapy or epidural steroid injections. (Tr. 235.) She was admitted for a microdiscectomy[14] and laminotomy.[15] (Tr. 236.) Dr. Raskas performed the

---

[11]Although the report states that Delbruegge was taking "Floroxatine," this appears to be a typographical error and that the correct spelling is "Fluoxetine." (Tr. 289.)

[12]Fluoxetine is used to treat depression, panic attacks, obsessive compulsive disorder, bulimia, and premenstrual dysphoric disorder. Alprazolam is used to treat anxiety and panic disorders. Estradiol is a female estrogen hormone used to treat menopause symptoms. http://www.webmd.com/drugs (last visited April 14, 2011).

[13]The nucleus pulposus is the soft fibrocartilage central portion of the intervertebral disc. Stedman's at 1343.

[14]A microdiscectomy is the surgical removal of some or all of a herniated disc through an incision in the back. During the surgery, the
(continued...)

procedure that day, and was confident that the nerve root and disc space were completely decompressed after the surgery. (Tr. 242-43, 272-73.) Upon discharge, she was instructed to take Percocet[16] for pain and follow-up with Dr. Raskas in two weeks. (Tr. 234.)

On August 9, 2004, Delbruegge contacted Dr. Raskas's office. (Tr. 269.) Delbruegge said that her pain level had decreased and was otherwise controlled by her pain medications, but that her back was tightening up, making it difficult for her to walk. (Id.) She was given Flexeril[17] and told to follow-up if there was no improvement. (Id.)

On August 18, 2004, Delbruegge followed-up with Dr. Raskas. (Tr. 268.) Her skin incision was healing fine, and she was doing well clinically. (Id.) Dr. Raskas told her to remain off work, and that he would evaluate her in a few weeks for the possibility of beginning physical therapy. (Tr. 268, 287.)

On September 17, 2004, Delbruegge was seen by Dr. Raskas. (Tr. 267.) She was feeling better than she was before the surgery, but still had aching pain down her leg. (Id.) An examination revealed slight weakness of the dorsiflexors of her left foot, although she appeared to be walking well. (Id.) Dr. Raskas recommended that she start physical therapy and return to work with light duty restrictions. (Tr. 267, 286.)

---

[14](...continued)
surgeon removes the portion of the disc that is herniated and protruding into the spinal canal. The disc space may also be explored, and any loose fragments of disc can be removed. http://www.webmd.com (last visited April 14, 2011).

[15]A laminotomy is the surgical removal of bone and/or thickened tissue done. The procedure is done to relieve pressure on the spinal cord or spinal nerve roots caused by age-related changes in the spine, spinal injuries, herniated discs, or tumors. http://www.webmd.com (last visited April 14, 2011).

[16]Percocet is used to help relieve moderate to severe pain. http://www.webmd.com/drugs (last visited April 14, 2011).

[17]Flexeril is used with rest and physical therapy to decease muscle pain and spasms associated with muscle strains and sprains. http://www.webmd.com/drugs (last visited April 14, 2011).

On September 21, 2004, Delbruegge contacted Dr. Raskas and told him that she could not work 8 hours a day and attend physical therapy. (Tr. 266.) Her work hours were amended to 6 hours/day on days she attended physical therapy, and 8 hours/day on the other days. (Tr. 266, 285.)

On September 23, 2004, Delbruegge was seen by Dr. Raskas. (Tr. 265.) She had returned to work, and attended her first physical therapy session that day. (Id.) She reported experiencing increased pain and back spasms, and that her therapist used heat and ultrasound to alleviate some of the symptoms and told to use heat/ice after work. (Id.) She said that she was not going to work until her back felt better. (Id.)

On October 18, 2004, Delbruegge was seen by Dr. Raskas. (Tr. 263.) Her leg and back pain had significantly improved compared to before the surgery, but she was still having leg and back pain. (Id.) Her tolerance for standing and sitting was also limited. (Id.) She was fired from her job after she was unable to return because she had been forced to stand longer than Dr. Raskas permitted. (Id.) A physical examination showed that her gait and strength were normal, and her functional range of motion was mildly reduced. (Id.) Dr. Raskas opined that she needed more physical therapy, and imposed some work restrictions, but noted that her amount of lifting and activity permitted were going to increase. (Tr. 263, 283-84.) She told Dr. Raskas that she thought he released her back to work too soon, which caused her to lose her job. (Tr. 263-64.) Dr. Raskas told her that release was appropriate, and that it was her employer's decision to terminate her employment. (Tr. 264.)

On November 22, 2004, Delbruegge was seen by Dr. Raskas. (Tr. 262.) Dr. Raskas noted that she was doing pretty well, although she got tired at the end of the day as her back got sore, and she had to take a Darvocet toward the end of the day. (Id.) Dr. Raskas also noted that she had progressed well in physical therapy, and opined that she was capable of an independent exercise program. (Id.) Dr. Raskas told her to follow-up in eight weeks, and released her to return to work at full duty. (Tr. 262, 282.)

On January 24, 2005, Delbruegge was seen by Dr. Raskas. (Tr. 261.) She was having pain her back and legs, which had not changed much. (Id.)

Dr. Raskas's examination revealed a full functional range of motion; that she could bend forward and almost touch her fingers to the ground; that her skin incision had healed fine; and that her neurological exam was normal. (Id.) Dr. Raskas opined that the results of the surgery were satisfactory/good, compared to how she was before the surgery; that she was much improved; and that she had a 10 percent permanent partial disability of her lumbar spine. (Id.) He placed no limitations on her ability to work. (Tr. 261, 281.)

On September 12, 2006, a medical consultant, A. Cooke, completed a Physical Residual Functional Capacity Assessment. (Tr. 340-45.) Cooke reported that Delbruegge could: (1) lift and/or carry 10 pounds occasionally and 10 pounds frequently; (2) stand and/or walk with normal breaks for at least 2 hours in an 8-hour workday; (3) sit with normal breaks for a total of about 6 hours in an 8-hour workday; and (4) push and/or pull for an otherwise unlimited amount of time. (Tr. 341.) Cooke also opined that Delbruegge could occasionally climb, stoop, kneel, crouch, and crawl, but never balance. (Tr. 343.) Cooke further opined that Delbruegge had no manipulative limitations, visual limitations, communicative limitations, or environmental limitations. (Tr. 343-45.)

On September 15, 2006, T. Dunn completed a Psychiatric Review Technique form. (Tr. 346-56.) Dunn opined that Delbruegge had no medically determinable psychiatric impairments. (Tr. 346.)

On July 8, 2008, Dr. Atkins diagnosed Delbruegge with radicular low back pain, lower extremity weakness, and bulging discs in her lumbar. (Tr. 388.) Dr. Atkins opined that Delbruegge was unable to sit for more than 15 minutes because she needed to move. (Id.) Dr. Atkins further opined that during an 8-hour workday, Delbruegge could: (1) walk less than 1 hour without interruption, or 1-2 hours total; (2) stand for less than 1 hour without interruption, or total in a day; and (3) sit for less than 1 hour without interruption, or total in a day. (Id.) Dr. Atkins also opined that Delbruegge could not lift more than 40 pounds, but that she actually could not lift 10 pounds or more due to radicular pain and bulging discs. (Id.) Dr. Atkins opined that she could not climb stairs or ladders. (Tr. 389.) Dr. Atkins noted that she was not disoriented or confused, but was frustrated and angry at her condition, especially

knowing it will be lifelong. (Id.) Delbruegge was taking extra strength Hydrocodone[18] every 4-6 hours, which may have caused fatigue, and Xanax[19] occasionally through the day and at bedtime to relax her muscles and mental levels. (Id.) Dr. Atkins opined that Delbruegge was unable to work an 8-hour day 5 days a week, and noted that she suffers from severe pain constantly. (Tr. 389-90.) Dr. Atkins found her reports of pain credible because he had treated her since 1993 and had no reason to doubt her. (Tr. 390.) Dr. Atkins opined that there was no way to correct her problems, and that she had done everything asked of her. (Id.) Dr. Atkins concluded that she could perform less than the full range of sedentary tasks, because she was unable to perform the minimal standing, walking, or prolonged sitting required by sedentary work. (Tr. 391.)

**Dr. Lichtenfeld's Reports**

On April 28, 2005, Mark A. Lichtenfeld, M.D., evaluated Delbruegge. (Tr. 299-304.) After summarizing Delbruegge's medical history, Dr. Lichtenfeld noted that she was taking Feldene,[20] Prozac, Xanax, and Estradiol, and that she smoked a pack of cigarettes each day for 19 years, but had recently cut back to a half a pack per day. (Tr. 301.) Dr. Lichtenfeld had seen Delbruegge three weeks prior, at which time Delbruegge complained of constant lower back pain spanning to her hips and her legs. (Tr. 302.) She also reported that increased activity, including vacuuming and yard work, increased her back pain; that her pain never went away; that she was experiencing numbness and weakness in her lower extremities; and that her pain woke her at night. (Id.) Dr. Lichtenfeld performed a straight leg raising test, which was positive on the left and negative on the right. (Id.) Dr. Lichtenfeld opined that

---

[18]Hydrocodone is used to treat symptoms caused by the common cold, flu, allergies, hay fever, or other breathing illnesses. http://www.webmd.com/drug (last visited April 14, 2011).

[19]Xanax is used to treat anxiety and panic disorders. http://www.webmd.com/drugs (last visited April 14, 2011).

[20]Feldene is used to reduce pain, swelling, and joint stiffness from arthritis, as well as gouty arthritis, arthritis of the spine, and muscle injuries. http://www.webmd.com/drugs (last visited April 14, 2011).

as a direct result of her injury at work on June 11, 2004, Delbruegge suffered: (1) chronic lumbrosacral spine strain; (2) herniated nucleus pulposus on the left at L4-5; (3) disc protrusion at L5-S1; (4) status post L4-L5 laminotomy; (5) status post L4-L5 microdissection and discectomy; and (6) left L5 and S1 radiculopathy.  (Tr. 303.)  Dr. Lichtenfeld further opined that as a result of the injury, Delbruegge had a 37.5 percent permanent partial disability.  (Id.)  Dr. Lichtenfeld also noted that Delbruegge was in need of further treatment, and that she had a number of work-related restrictions, including: (1) no twisting, bending, or stooping; (2) lifting limited to between the waist and shoulder height; (3) no lifting from the ground to her waist, or from her shoulder to her head; (4) no lifting 30-40 pounds; (5) no repetitive lifting; (5) no operating power tools; (5) avoiding lifting her arms outstretched or overhead; (6) no prolonged standing and sitting without alterations at least once every hour as needed; and (7) no ascending and descending ladders, stairs, and inclines.  (Id.)

On June 6, 2005, after reviewing an MRI scan report and films taken on February 15, 2002 and MRI scan films taken on July 1, 2004, Dr. Lichtenfeld amended his diagnosis of "disc protrusion at L5-S1" to "bulging disc on the left at L5-S1."  (Tr. 305.)  Dr. Lichtenfeld noted that these findings were consistent with those of Dr. Atkins.  (Id.)

Dr. Lichtenfeld explained in his June 6, 2005 report that Delbruegge's February 15, 2002 MRI scan films revealed the following: (1) at L3-4, no significant bulging of the disc; no evidence of narrowing of the spinal canal; no significant degenerative changes; and no neuroforaminal narrowing; (2) at L4-5, a generalized disc bulge that impresses upon the thecal sac; no lateralization of the disc bulge; no neuroforaminal narrowing; no spinal stenosis; and no significant degenerative changes; and (3) at L5-S1, a generalized disc bulge that abuts the thecal sac but does not cause any significant impression; no lateralization of the disc bulge; no neuroforaminal narrowing; no degenerative changes; and no spinal stenosis.  (Tr. 306.)  Dr. Lichtenfeld opined that Delbruegge's July 1, 2004 MRI scan films revealed the following: (1) at L3-4, a minimal generalized bulging disc that does not impress upon the thecal sac, nor lateralize, nor cause any

neuroforaminal encroachment, and no evidence of facet arthropathy or spinal stenosis; (2) at L4-5, a herniated nucleus pulposus that impresses and indents the thecal sac and lateralizes to the left; narrowing of the left neural foramen; and that he was unsure whether there was nerve root impingement; and (3) at L5-S1, a bulging disc that lateralizes to the left and indents the thecal sac; narrowing of the left neural foramen; and some impingement on the left S1 nerve root. (Id.)

On July 13, 2005, Dr. Lichtenfeld noted that he treated Delbruegge with Robaxin,[21] and ordered MRI scans for July 6, 2005. (Tr. 309.) Based on the new MRI scan films, Dr. Lichtenfeld added 2 diagnoses to his 6 diagnoses from his April 28, 2005 report; (7) post-operative epidural fibrosis on the left at L4-5; and (8) left S1 neuroforaminal encroachment. (Id.) Dr. Lichtenfeld opined that Delbruegge undergo additional testing, and imposed the same restrictions as in his April 28, 2005 report. (Id.)

Dr. Lichtenfeld explained in his July 13, 2005 report that Delbruegge's July 6, 2005 MRI scan films revealed the following: (1) at L4-5, post operative changes in the form of a left L4 laminectomy and discectomy, and a small, dark area that could be consistent with a small reherniation of the disc; and (2) at L5-S1, left lateralized bulging of the disc; that the disc appeared to be extruded to the left at L5-S1 causing narrowing of the left S1 neural foramen; and that the disc abuts and indents the thecal sac. (Tr. 310.) Dr. Lichtenfeld noted no spinal stenosis in the lumbar spine, and no facet arthropathy. (Id.)

On November 3, 2005, Dr. Lichtenfeld evaluated the opinion of Dr. Michael Boland, dated September 30, 2005, in which Dr. Boland opined that the focal protrusion of Delbruegge's L5-S1 was a new finding because he did not note it on the July 1, 2004 MRI scan.[22] (Tr. 307.) Dr. Lichtenfeld disagreed with Dr. Boland's opinion, and believed that his interpretation of the July 1, 2004 and July 6, 2005 MRI scan films was correct. (Id.)

_____

[21]Robaxin is used to relax muscles, thereby decreasing muscle pain and spasms. http://www.webmd.com/drugs (last visited April 14, 2011).

[22]Dr. Boland's report is not included in the record.

**Dr. Tunstall-Robinson's Report**

On September 5, 2006, L.C. Tunstall-Robinson, M.D., evaluated Delbruegge for Social Security Disability determination purposes. (Tr. 334-39.) In her report accompanying her evaluation, Dr. Tunstall-Robinson wrote the following:

Delbruegge said that she was injured while working in June, 2004. (Tr. 336.) Delbruegge explained that she slipped while attempting to lift a box, and leaned over and caught herself to avoid falling, but in doing so she twisted her back. (<u>Id.</u>) She felt a little uncomfortable in her back the next day, and she was unable to get out of bed because of severe pain three days after the injury. (<u>Id.</u>) She notified her employer four days after the injury, and was referred to a back specialist, who performed a work-up and evaluation, including an MRI, which revealed a herniated disc in her lower back. (<u>Id.</u>) Therapy and steroid shots did not help her discomfort. (Tr. 336-37.) She had significant, sharp, shooting pain in her lower back, radiating down her left lower extremity to her ankle. (<u>Id.</u>)

On August 5, 2004, she had surgery. (Tr. 336-37.) She initially felt better after surgery, but over time she progressively returned to her pre-surgical state of discomfort. (Tr. 337.) She was told that she had degenerative disc disease and that nothing could be done for her. (<u>Id.</u>) She was surgically released in February, 2005. (<u>Id.</u>)

She has trouble walking or sitting for more than a few minutes, and must constantly move or change positions to avoid increasing pain and discomfort. (<u>Id.</u>) She has difficulty sleeping at night. (<u>Id.</u>) She was previously active and involved in physical sports, including swimming, but because of her severe pain she is afraid to go into deep water. (<u>Id.</u>) She was given Vicodin ES[23] therapy for treatment for her back, which she would take on an as-needed basis. (Tr. 337.)

She was diagnosed with osteochondritis of her right ankle in 1990, when she was having severe pain in her ankle. (<u>Id.</u>) She denied any definite trauma, and was referred to a podiatrist who took x-rays and

---

[23]Vicodin is a combination medicine used to relieve moderate to severe pain. <u>http://www.webmd.com/drugs</u> (last visited April 14, 2011).

made the diagnosis.  (Id.)  She had an insert made for her shoe, which helped her ankle pain, but does not wear the insert often because it causes discomfort to the plantar surface of her foot. (Id.)  She law saw her podiatrist in 1990.  (Id.)  She described the pain as a throbbing sensation in her ankle, and was given Feldene to take as needed for discomfort.  (Id.)

She was diagnosed by her private physician with an anxiety disorder. (Tr. 337.)  She saw a psychiatrist once in 1999 for severe anxiety and depression after learning that her daughter was pregnant with twins. (Id.)  She lost the best job and salary she had ever had because of her severe anxiety and depression.  (Id.)  She does not see either a psychiatrist or a psychologist on a regular basis.  (Id.)

A physical examination of Delbruegge revealed that she had a normal gait; significant decreased sensory sensation in her left lower extremity; and decreased discriminatory sensation in her left lower extremity.  (Tr. 338-39.)  She was able to squat and heel-and-toe-walk, although she had decreased motor strength of her lower left extremity. (Tr. 339.)  She had some limitation of range of motion, and was unable to straight leg raise from a supine position more than 30 degrees with her right lower extremity and 15 degrees with her left lower extremity. (Tr. 335, 339.)  She complained of severe pain in her lower back when walking.  (Tr. 339.)

Dr. Tunstall-Robinson found Delbruegge's records compatible with her statements, and opined that her MRI report demonstrated findings of disc extrusion at L4-L5 on the left with some bulging and degenerative disc changes with central disc protrusion at L5-S1.  (Id.)  Clinical impressions were: (1) disc disease with degeneration of the lumbrosacral spine region with radiculopathy; (2) osteochondritis of the right foot and ankle, per history; and (3) probable anxiety disorder.  (Id.)

**Testimony at the Hearing**

On July 15, 2008, Delbruegge testified before the ALJ.  (Tr. 25-56.) At the time fo the hearing, she lived at home with her husband.  (Tr. 28.)  She completed the twelfth grade, and does not have any vocational or technical training.  (Tr. 29.)  She was a self-employed home cleaner

- 14 -

for a very short time, but could not remember when she stopped.  (Tr. 29-30.)  She was employed as a home cleaner by Cynthia Cooper for a short time sometime in 2007.[24]  (Tr. 30.)  She previously worked as a pet-sitter for Nancy Crane in December, 2007.  (<u>Id.</u>)  She applied for unemployment benefits in September, 2004, and received benefits through April, 2005.  (Tr. 31.)  She applied for worker's compensation benefits in June, 2004, and her application settled in July, 2006.  (Tr. 31-32.)

She injured herself in June, 2004 when she lifted a 40-pound box incorrectly, causing it to slip.  (Tr. 34.)  She was diagnosed with herniated discs and L4-L5 and S1.  (<u>Id.</u>)  She had surgery, but it did not help.  (<u>Id.</u>)  She rated her lower back pain a 7/10, but by laying down or taking medication, the pain is only a 6/10.  (Tr. 32-33.)  The radicular pain in her left leg feels like an electrical current, and runs to the outside of her ankle.  (Tr. 33.)  She sometimes has numbness and tingling in her left foot, and her left leg is very weak.  (Tr. 33-34.)  She has had the pain and other symptoms since her accident.  (Tr. 34.)

She has uncontrollable back spasms that last up to a half of a day and occur 2-3 times per month.  (Tr. 36.)  She rated the pain caused by her back spasms an 8/10.  (<u>Id.</u>)  When she has a back spasm, she takes an Alprazolam and lays down.  (Tr. 36-37.)  Her other medications are Hydrocodone and Feldene.  (Tr. 37.)

She leaves her house 2-3 times a week to do her errands and visit her daughter.  (Tr. 38.)  She only goes out 2-3 times a week because with her physical problems she is more comfortable at home, it costs money to go out, and she can rest whenever she needs to while at home.  (Tr. 38-39.)  She never goes to the movies because she is not able to sit, but goes to restaurants about once a month.  (Tr. 39.)

Although cooking is her hobby, she and her husband split the cooking because he enjoys cooking and she cannot cook for long before her back hurts.  (Tr. 40.)  She and her husband also split the household chores: he does anything heavy, such as vacuuming, and she makes the beds and folds the laundry.  (<u>Id.</u>)  When completing these chores, she works for

---

[24]The ALJ told Delbruegge that she was incorrect, and that she had worked as recently as January, 2008 as a home cleaner for Cynthia Cooper. (Tr. 30.)

only 10-15 minutes consecutively before taking a break. (Id.) She goes grocery shopping at the store with a helper, and her husband stays home and helps unload the groceries. (Tr. 41.) She does not do any yardwork, and needs to lay down about twice a day. (Id.)

Her most recent job prior to her alleged onset date of disability was with Ray Oil Company. (Tr. 42.) It was a physically demanding and fast paced job that required her to be on her feet for 80 percent of the day. (Id.) She managed 6 people and had to lift up to 80 pounds, bend, crouch, and stoop. (Tr. 43.)

She also worked as a cashier for Northwest High School; an office assistant for Custom Wood Specialists; a mortgage loan processor for Alliance Credit Union; and a mortgage loan processor at Colonial Bank. (Id.) None of the jobs were as physically demanding as her job with Ray Oil. (Tr. 44.) At her least physically demanding job, with Colonial Bank, she was required to spend 90 percent of her time at a desk taking care of customers, but did not lift, bend, crouch, or stoop. (Id.)

She has always worked whenever she was able. (Id.) Her earnings dropped from 2001 to 2002 because she wanted to cook, and went to work for a school so she could cook. (Tr. 45.) However, the school had her work mostly as a cashier and not as a cook. (Id.) When working for Nancy Crane's Family Pet Services, she fed dogs, gave dogs their medicine, and walked small dogs. (Tr. 46.) She did not clean the kennels.[25] (Tr. 47.) The job required her to be on her feet, although she only worked 3-6 hours a day and only a few times each week.[26] (Tr. 46-47.) She earned only $4,494.24 in 2006 while working at Nancy Crane's because although she loved the animals, she was used mostly when other

---

[25]The ALJ questioned Delbruegge about her testimony that she did not clean the kennels with the duties she listed in her work history report, which included cleaning dog kennels, hosing concrete, walking dogs, washing and drying dishes, recessing the dogs, and feeding the dogs and cats. (Tr. 47.) Delbruegge responded that she did not regularly clean the kennels, and only did so if a dog vomited. (Tr. 48.)

[26]The ALJ also questioned Delbruegge about the duties she listed in her work history report, including kneeling for two hours, to which Delbruegge responded that she made a mistake in her report. (Tr. 48.)

employees called in sick or if the owner needed extra help. (Tr. 49-50.) She stopped working there in December, 2007. (Tr. 50.)

She tried to start her own housecleaning business, but it did not work out. (Tr. 48-49.) She was hired by Cynthia Cooper as a housekeeper for about two days, but she could not keep up. (Tr. 49.) She did not earn any other money as a self-employed housekeeper. (Id.)

She can stand for only 10-15 minutes consecutively before she gets pain in her back and legs and needs to move. (Tr. 50.) She enjoys walking, but gets pain in her left leg after about two blocks. (Id.) She generally does not lift, and could hold only two grocery bags, two gallons of milk, or 10 pounds, but not lift them above her chest.[27] (Tr. 51.) She does not bend, crouch, or stoop, and can sit for only 10-15 minutes before she has to move, or else she has to lay down or take pain medication. (Tr. 52.) She could not return to her job at Colonial Bank because she cannot sit for long enough, and cannot sufficiently concentrate because of her pain. (Tr. 52-53.) Nor could she return to any of her previous jobs. (Tr. 53.) Her condition is staying the same, and no doctors have told her that it can improve. (Tr. 54.)

At the end of the hearing, Delbruegge's counsel sought to have the ALJ take judicial notice of Listing § 1.04A of the Social Security Listing of Impairments. (Tr. 55.) The ALJ did so. (Tr. 55-56.)

### III. DECISION OF THE ALJ

On July 22, 2008, the ALJ issued an unfavorable decision finding that Delbruegge was not disabled. (Tr. 11-21.) The ALJ found that Delbruegge had not engaged in substantial gainful activity since July 6, 2005, her amended alleged disability onset date. (Tr. 13.) The ALJ found that Delbruegge had severe impairments of degenerative disc disease of the lumbar spine and residuals from a laminotomy and microdisectomy, but that the osteochondrosis of her ankle was not a severe impairment.

---

[27]Delbruegge testified that she could hold 10 pounds, or two gallons of milk. (Tr. 51.) After the ALJ told her that a gallon of milk weighed 10 pounds, she testified that she was unsure as to the weight of what she could lift. (Id.)

(Tr. 13-14.)  The ALJ also found that Delbruegge did not suffer from any severe mental impairments.  (<u>Id.</u>)

The ALJ found that Delbruegge's severe impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing of Impairments. (Tr. 14.)  Specifically, the ALJ found that Delbruegge's low back pain and alleged radicular symptoms did not meet the requirements of Listing § 1.04A.  (<u>Id.</u>)  The ALJ explained that Delbruegge had no positive straight leg raise tests prior to surgery, her leg pain did not follow a radicular pattern, and her back surgeon cleared her to return to full work duties after the surgery. (<u>Id.</u>)  The ALJ further reasoned that Delbruegge told inconsistent stories to different doctors, and that her stories were instead consistent with secondary gain for her worker's compensation claim and claim for disability benefits.  (<u>Id.</u>)  The ALJ noted that Delbruegge's straight leg raise tests were less restrictive immediately after her injury than when she was examined for disability benefits, and that her surgeon's findings conflicted with her complaints.  (<u>Id.</u>)  The ALJ concluded that there was no credible substantial evidence of a limitation to walking that met the requirements of Listing § 1.04(A).  (<u>Id.</u>)

The ALJ also found that Delbruegge retained the residual functional capacity (RFC) to perform light work, except that she was limited to understanding, remembering, and carrying out at least simple repetitive instructions, but not complex and detailed instructions.  (Tr. 14-19.) Although Delbruegge was unable to perform any PRW, based on the Medical-Vocational Rules, the ALJ found that she could perform other work that existed in significant numbers in the national economy.  (Tr. 20.) Therefore, the ALJ concluded that Delbruegge was not under a disability as defined under the Act.

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough

that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Id. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the ALJ determined that Delbruegge could not perform her PRW, but that she maintained the RFC to perform other work in the national economy.

## V.  DISCUSSION

Delbruegge argues the ALJ erred in finding she did not meet the requirements of the Listing § 1.04(A), found in 20 C.F.R. Pt. 404, Subpt. P, App'x 1, because the opinions of Dr. Lichtenfeld and Dr. Tunstall-Robinson prove her impairment meets Listing § 1.04A.

Listing § 1.04A is the listing for disorders of the spine. Id. To meet Listing § 1.04A and give rise to a conclusive presumption of disability, Delbruegge must establish that she suffers from a spinal disorder (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in the compromise of a nerve root or the spinal cord, accompanied with evidence of (1) nerve root compression characterized by neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss; and (4) if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). Id. Delbruegge bears the burden of establishing each of the elements of the listed impairment. Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010).

### Dr. Lichtenfeld and Dr. Tunstall-Robinson

The ALJ afforded the opinions of Dr. Lichtenfeld and Dr. Tunstall-Robinson little weight, and instead relied on Dr. Raskas's opinion.[28] Following the surgery that he performed, Dr. Raskas noted Delbruegge's pain level had decreased and was controlled by her pain medications. (Tr. 269.) Dr. Raskas noted that Delbruegge's leg and back pain significantly improved and was progressing well. (Tr. 262-63). A straight leg raise test performed by Dr. Raskas was negative. (Tr. 385.) Dr. Raskas opined Delbruegge was only 10 percent disabled, and released her to return to work without restriction after her surgery. (Tr. 261, 281.)

---

[28]The Commissioner argues that Dr. Lichtenfeld's opinion does not establish nerve root compression. Because the ALJ did not err in affording Dr. Lichtenfeld's opinion little weight, whether Dr. Lichtenfeld's opinion would have established the requisite nerve root compression required by Listing § 1.04A is moot.

Dr. Lichtenfeld and Dr. Tunstall-Robinson were consultative physicians who each saw Delbruegge only once. "Generally, if a consulting physician examines a claimant only once, his or her opinion is not considered substantial evidence, especially if the treating physician contradicts the consulting physician's opinion." <u>Charles v. Barnhart</u>, 375 F.3d 777, 783 (8th Cir. 2004). Given Dr. Raskas's extensive history treating Delbruegge, the ALJ did not err in affording his opinion greater weight than those of one-time consultative examiners.[29]

Further, the ALJ noted that the findings of Dr. Lichtenfeld and Dr. Tunstall-Robinson were based on Delbruegge's subjective complaints, which the ALJ found not credible.[30] <u>Gaddis v. Chater</u>, 76 F.3d 893, 895 (8th Cir. 1996) (ALJ may discount physician's opinion based on claimant's subjective complaints which the ALJ has found not credible). <u>See also</u> <u>Conklin v. Barnhart</u>, 206 Fed. App'x 633, 637 (8th Cir. 2006) (per curiam).

The ALJ also found Dr. Tunstall-Robinson's report was based on Delbruegge's exaggerations of her impairments in that Delbruegge had much greater limitations and strength problems in the disability evaluation examination than in any treatment record. "An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations." <u>Turner v. Astrue</u>, 390 Fed. App'x 581, 586 (7th Cir. 2010) (per curiam) (quotation omitted).

The ALJ also noted that Delbruegge gave inconsistent stories to Dr. Lichtenfeld and Dr. Tunstall-Robinson, in that she told Dr. Lichtenfeld that she was in severe pain after her surgery and had difficulty throughout her recovery, while she told Dr. Tunstall-Robinson that she initially received some relief after surgery but her pain progressively returned. <u>See</u> <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1148 (8th Cir. 2001) (ALJ

---

[29]Delbruegge's only challenge to Dr. Raskas's opinions are that they were made before her alleged onset date. However, Dr. Raskas's opinions date before and after Delbruegge's corrective surgery, and correlate to her alleged disabilities. That they date prior to Delbruegge's alleged onset date does not bar their consideration. <u>See, e.g.</u>, <u>Hamlin v. Barnhart</u>, 365 F.3d 1208, 1215 (10th Cir. 2004); <u>Vigil v. Astrue</u>, Civil No. 08-cv-02124-LTB, 2009 WL 2176652, at *6 (D. Colo. July 22, 2009).

[30]Delbruegge does not challenge the ALJ's findings concerning her credibility.

may look at inconsistencies in the record in resolving conflicting medical testimony).  In addition, the ALJ found Delbruegge's daily activities were inconsistent with the opinions of Dr. Lichtenfeld and Dr. Tunstall-Robinson.  Owen v. Astrue, 551 F.3d 792, 799 (8th Cir. 2008).

In sum, the ALJ did not err in affording the opinions of Dr. Lichtenfeld and Dr. Tunstall-Robinson little weight.  Because substantial evidence supports the ALJ's determination, the court must affirm.  Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009).  See Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010) (substantial evidence supported ALJ's determination that claimant's severe impairments did not meet listed impairment); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001) (same).


**Positive Straight Leg Raise Tests**

Delbruegge also argues that the ALJ erroneously found that she did not have positive straight leg raise tests.  In her Step Three analysis, the ALJ stated, "Even prior to surgery [Delbruegge] had no positive [s]traight leg raise tests . . . ."  (Tr. 14.)  However, included in the record are positive straight leg raise tests.  (Tr. 302, 335, 339.)

Despite her statement to the contrary, the ALJ recognized Delbruegge's positive straight leg raise tests, noting that she "had ninety degree straight leg raise tests on the right and seventy on the left," and that she "could only lift her legs thirty degrees on the right and fifteen on the left at the consultative evaluation on September 5, 2006."  (Tr. 14.)  Thus, the record indicates that the ALJ's findings were made after considering all of Delbruegge's straight leg raise tests.

Further, Delbruegge's positive tests do not satisfy Listing § 1.04A because the record does not conclusively establish that Delbruegge had both positive sitting and supine tests.[31]  Thus, substantial evidence supports the ALJ's decision.  See King v. Astrue, C.A. No. 2:09-2358-RSC, 2010 WL 3430781, at *5 (D.S.C. Aug. 31, 2010); Hardy v. Astrue, No. CIV

---

[31]Although Dr. Tunstall-Robinson reported positive straight leg raise testing from the supine position, she noted no positive findings from the seated position.  (Tr. 335, 339.)  Dr. Lichtenfeld reported a positive straight leg raising test, but did not indicate whether the test was performed from the seated or supine position.  (Tr. 302.)

S-08-1327 GGH, 2009 WL 2880707, at *5 (E.D. Cal. Sept. 3, 2009); Hand v. Astrue, No. 5:07cv258-RH/MD, 2008 WL 4525358, at *9 (N.D. Fla. Oct. 3, 2008).

In addition, because the ALJ did not err in determining Delbruegge did not establish all elements of Listing § 1.04A, any error that the ALJ may have made regarding Delbruegge's positive straight leg raise tests does not require remand.  See Johnson, 390 F.3d at 1070 (8th Cir. 2004).

**Walking Limitations**

Delbruegge argues that the ALJ erred by considering whether she had any limitations in her ability to walk.  In her analysis, the ALJ found Delbruegge's "stories . . . [were] the sole basis for [her] alleged limitations in walking that would satisfy the medical requirements of [Listing §] 1.04A," and that there was "no credible substantial evidence of a limitation to walking that would meet the requirements of [Listing §] 1.04A."  (Tr. 14.)

Although Listing § 1.04A does not necessarily require limitations in walking, the claimant's ability to walk is "a factor to be considered under all of the Musculoskeletal System Listings."  Rouse v. Astrue, No. 8:08-cv-2281-T-23TBM, 2010 WL 457320, at *5 n.5 (M.D. Fla. Feb. 4, 2010). See also Reed v. Comm'r of Soc. Sec., No. 07-15275, 2009 WL 877691, at *8 n.4 (E.D. Mich. Mar. 30, 2009) ("An inability to 'ambulate effectively' is part of Listing [§] 1.04C, but is also applicable to an examination of [Listing §] 1.04A given that both a loss of strength and feeling can inhibit walking . . . ."); Cornelius v. Astrue, Civil Action No. 06-1361-MLB, 2008 WL 111315, at *7 (D. Kan. Jan. 7, 2008) ("[T]he inability to walk . . . may be considered evidence of significant motor loss.").

Therefore, the ALJ's discussion of Delbruegge's walking limitations does not require remand.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


  /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on April 25, 2011.